The next case, number 23-1290, United States Securities and Exchange Commission v. Hedy Yolanda Sanchez Diaz Monge. And at this time, would counsel for the appellant please introduce himself on the record to begin. Good morning. May it please the Court, Brooks Westergaard on behalf of Relief Defendant Appellant Hedy Yolanda Sanchez Diaz Monge. With this Court's permission, I would like to reserve four minutes for rebuttal. You may. Thank you. Earlier this year, the District Court below entered its order granting Securities and Exchange Commission's motion for remedies wherein the Commission sought disgorgement and prejudgment interest for the funds used to purchase a 2017 BMW X5 SUV, which I'll refer to as the BMW or the subject BMW. The District Court ordered that Ms. Sanchez Diaz pay $134,500, which represented the original purchase price of the BMW, and $35,304 in prejudgment interest. Does the record show the prejudgment interest calculation? In other words, how much of the prejudgment interest accrued under the calculation prior to the point where she was asked to give the money back? Your Honor, I would have to check the record to answer that question. I'm not sure how much of it accrued, but it was based on the reserved delinquent payment calculation. But the Commission sought and was granted that full $35,000 in change in prejudgment interest. What was the start date of the calculation? The start date of the calculation, if I'm correct, Your Honor, would have been the purchase price, the date of the purchase of the SUV. As she did below, Ms. Sanchez Diaz seeks reversal of the District Court's order for three independent reasons. First, Ms. Sanchez Diaz argues here and below that she had a legitimate claim to the BMW based on a separation agreement between her and another defendant in this action, Mr. Luis Carrillo. Pursuant to that separation agreement, among other things, Mr. Carrillo agreed to purchase for Ms. Sanchez Diaz a new car every three years. What obligation did that supplemental agreement impose on her that she did not already bear? That is really the heart of this appeal, I think. The separation agreement, if you read it in its entirety, was clearly for the benefit of their minor child. Pursuant to the separation agreement, Mr. Carrillo agreed to provide not only the car, but also $10,000 a month in child support. He agreed to cover the medical expenses for the minor child, the tuition expenses for the minor child, educational expenses for the minor child, as well as maintenance on the home that Ms. Sanchez Diaz, the minor child, lived in until the minor child turned 19 years old or started postgraduate studies. Counsel, is one of the things that changed between the earlier agreement and the agreement that you're talking about that your client's ex-husband left the country and so wasn't seeing the child on the weekends anymore? In other words, your client now had responsibility, legal, physical, custody, 100 percent, 24-7, 365 days a year. That's right, and I think that dovetails into your Honor's question about the ongoing obligations that my client agreed to perform pursuant to this agreement. So, yes, we submitted evidence below that my client had not just been a single mother when the supplemental agreement was inked, but before that for 13 years, to be precise. The continuing obligations for my client to provide exclusive custody and guardianship duties, that was present before the supplemental agreement in 2016 was signed. That's true. But those ongoing obligations were made pursuant to this agreement, and our position is that constitutes fair consideration. Now, the district court below made— What is the fair consideration? I'm sorry, Your Honor. What is the fair consideration? The fairest consideration is the guardianship and the custody obligations that my client had for their minor child. Now, I understand that in a contract sense, consideration for ongoing obligations, not to conflate the obligations that come along with guardianship and custody, but from our perspective, this is not unlike an employment agreement, where continuing employment is sufficient consideration for things like, say, arbitration, enforceability of arbitration agreements, or non-compete clauses, which states relatively uniformly found to be enforceable. But, counsel, you agree that your client had to provide something of value in exchange for the car, right? That's the legal standard, essentially? Provide something of value or give something up of value. And the value that she provided, in your view here, is essentially the daily care of their son, correct? That's part of it, yes. The daily care of the son is what she provided. What she gave up was her employment. And we introduced into the record, through my client's declaration, that said the obligations that Mr. Carrillo was supposed to provide through the 2016 agreement allowed her to essentially quit working. But doesn't the agreement itself contradict that? It says that they're both, the plain text of it, I believe, says that they're both working outside of the home. That's correct, Your Honor. Well, it says that they have, they were not obligated to provide spousal support for each other because they had sufficient funds to support themselves. But doesn't it explicitly say they're both working outside the home, counsel? It does say that at the time the agreement was inked, yes. But that is. . . But that wasn't true when she submitted her declaration? When she submitted her declaration, correct. And in her declaration, she did say that the obligations pursuant to the separation agreement did allow her to essentially stay at home and be a full-time caretaker for their minor child. And she committed to do that for the next six years, essentially, in that agreement? That's correct, until the minor child turned 19 years old or started post-grad studies, whatever occurred earlier. So which language in the agreement are you relying on? Is it joint appendix 170 to 171 is the agreement, and its clauses 2 through 4, and it looks like 6 through 7. And the termination provisions are the child support agreement. Again, that's joint appendix 171, clause 8. And that is the provision that says the obligations to Mr. Carrillo would terminate when their minor child began university studies or turned 19 years old, whichever came earlier. So you're saying but for this agreement, their obligations relative to one another would have been different? I'm sorry, Your Honor, the obligations relative to Mr. Carrillo. The divorced spouse's relative agreements were different prior to this agreement than after? There was a prior agreement, yes, but this agreement incorporated that old agreement and then provided for the additional obligations on behalf of both parties therein. And what specific language imposes an additional obligation on her that she did not have the day before this was signed? The additional obligations pursuant to the agreement were laid out as far as her retaining exclusive custody and guardianship of the minor child. Now, I realize that that was in the prior agreement also, but this extends that into the time when the child turns either 19 or resumes. But the other one didn't terminate before then, did it? Understood, Your Honor, no, it didn't. So, again, if I were to ask, on the day she signed this, what obligation did she assume that she did not have the day before she signed this? I'm hearing nothing. She had the same obligations. They just continued, but they would have continued anyhow had she not signed this. I understand, Your Honor, and yes, I think that's right. But, counsel, can I just go back because maybe I misunderstood something, but I thought there was a real difference because, again, under the prior agreement, even though she had full legal custody, the father was seeing the child on the weekends, correct? That's right. And then before this agreement, the 2016 agreement, the father leaves the country. She now has the child 100% of the time, 365 days a year. That is a difference, right, when you literally have no time anymore when you're not providing care for a child. Understood, Your Honor. Yes, and you were previewing what I was about to say is that this new agreement, it does incorporate the old agreement. And strictly with respect to the obligations that were imposed under the old agreement, this agreement does expand on them in a sense. And that is the scope of guardianship and custodial duties of Ms. Sanchez Diaz to their minor child. So, notionally, are you suggesting we should look at it this way, which is that she had a certain agreement in place de facto because of what they were doing factually and imposed certain obligations on her time, money, et cetera. Her husband's situation didn't change, so he was going to be doing less, she was going to be doing more. So she could have gone and sought to reopen the agreement to adjust to that new reality. Instead, she got this. I think that's right, Your Honor, if I'm understanding your question correctly. And, counsel, I know you're not an expert in divorce or child custody, but isn't that a pretty common situation that happens all the time over the 18 or 19 years that a child is being raised? Situations change for the child or one of the parents, and all the time people go to court and ask for modifications of the child care arrangements, the support, et cetera. Correct. And that is related to our reliance on the California Family Code in this case, which provides that the agreement between separating spouses is consideration by itself. Now, we also submitted a declaration from the Honorable Judge Vasquez, who was a judge in Mexico, who also submitted a declaration which provided that these types of child support and custodial agreements are very common in Mexico. So what we have here is we have a confluence between the Commission's Discouragement Authority under Section 78 U.D. 5 and then state law and international law, and how do those talk to each other. And what the district court did below is say, okay, this contract may be enforceable between Mr. Carrillo and Ms. Sanchez-Diaz, but the district court said he was going to look at this in the bankruptcy law context, which was did Ms. Sanchez-Diaz provide fair and equivalent value in exchange for the BMW. Now, property rights have to come from somewhere, and the Court in Walsh in the Second Circuit looked to New York state law to essentially see if the CFTC case there, but the point remains is that it looked to the state law for property rights. And here, if you look at California law, she had a legitimate claim to the BMW. Thank you. Thank you. Thank you, counsel. At this time, if counsel for the appellee would please introduce himself on the record to begin. May it please the Court, Stephen Silverman for the Commission. The district court did not abuse its discretion when it ordered Sanchez-Diaz to disclose $135,000 in illicit proceeds that were used to buy her a luxury BMW. The court reached that conclusion following discovery, briefing, and a hearing, after which it held that Sanchez-Diaz lacked a legitimate claim to the BMW because it found that she did not provide any services or value in exchange. The facts are not in dispute. In 2009, Sanchez-Diaz and her ex-husband separated and entered into a divorce decree that gave her full custody over their child with vegetation rights and, in exchange, compensated her with monthly payments, payments for their child's medical concerns, and payments for their child's schooling and extracurricular activities. Over the next seven years, her ex-husband engaged in extensive securities fraud, resulting in the receipt of millions of dollars in illegal proceeds from victims of that fraud. Then, in 2016, Sanchez-Diaz entered into an agreement with her ex-husband that she was not— But, counsel, you're not alleging that Ms. Sanchez-Diaz was aware of the fraud, right, that there's no allegation that she participated in the husband's fraud? No, Your Honor. And in 2016, after that fraud occurred— Counsel, can I just pick up on one point that you made, though? I thought I heard you just say that the district court said that she provided no value? No goods and services, but she did not provide any services or value in exchange for the BMW. Correct, Your Honor. I thought the whole point was that the court applied essentially a bankruptcy-type definition and required equivalent value as opposed to, say, consideration. I just want to know what you think the court held. I think the district court made a finding that she did not provide any goods or services of value. And I think that this reference to bankruptcy law was more or less an analogy being used to apply equitable principles which require that some actual or fair value be provided in exchange for the ill-gotten proceeds. And I just want to come back to what happened in 2016, which is that she entered into an agreement with her ex-husband that changed none of her existing obligations but provided that she would receive increased monthly payments, additional money for living expenses, and a new car every three years. The only things that changed from 2009 to 2016 are that her ex-husband received a windfall of money from engaging in security fraud and Sanchez-Diaz received increased money from her ex-husband, including the luxury BMW. But, counsel, I don't think that's true factually because, again, under the previous agreement, the father was helping to take care of the child, and so the mother had some period of time to herself when she could do things that she needed for her own life, whatever that may be. Now, she's taking care of this child 100% of the time, 24-7, 365 days a year. How is that not a change? I would say two things, Your Honor. First of all, Sanchez-Diaz in the district court, Joint Appendix 260, acknowledges that she simply retained full custody of the child, as well as in the opening brief of page 9, acknowledges retaining full custody of the child. So there was not a change in that custody arrangement. In addition, the 2016 agreement does not- But it was a change in the arrangement because, again, the father was seeing the child on the weekends, and now the father is out of the country, and she's responsible for full caretaking of the child. So I guess I'm just wondering, is it your position, is it the SEC's position, that taking care of a child, a minor child, 100% of the time is not something of value? Well, Your Honor, it is not. Certainly, providing child care can be something of value. But if I could just turn back to the facts here, the 2016 agreement did not supplant. It was consistent. It only amended the prior agreement to the extent that it was inconsistent. And so to the extent that there were visitation rights that existed in the prior agreement, those visitation rights continue to exist. And my third point is that there's nothing in the record to the effect of some sort of changed obligations with respect to the husband and what he's doing. But Sandra Diaz had every opportunity to make that case in her declaration and the court below to argue that she was providing more value in services by taking on more child support obligations. But that's not what's in the record. The record is that she was a full custodian of a child and she remained a full custodian of a child. If she wanted to make the case that she was providing something in addition, then she could have, but that's not what the record reflects. And, again, it doesn't – How is that not what the record reflects? She says in her declaration that she gave up working to provide full care for her child, and I was able to see in the record that the father had moved out of the country. Now she was, again, taking care of the child 100% of the time. So how is that not in the record? Well, the district court did not credit her obligation with respect to giving up work because the agreement itself in 2016, in that agreement, both parties provide that they have sufficient assets and are, in fact, employed at that time. So in that respect, it's not in the record that she's giving up any work obligations or not. And then, again, in 2016, there's nothing that suggests that Mr. Carrillo cannot, you know, has given up his vegetation rights. There's absolutely nothing in the agreement indicating that he has forfeited the right to visit his child. In fact, if the record reflects it, the sense of the idea is, excuse me, Mr. Carrillo remained on the insurance policy of these cars and the cars so that he was allowed to continue to utilize these vehicles, excuse me, the BMW, but there are also three other luxury vehicles that she had. Mr. Carrillo could still use these vehicles when he came to visit because he was an insured individual until right when the SEC filed this lawsuit. Doesn't the record show, I thought it was undisputed, that he hadn't been in the country in years. Are you disputing that? That was her testimony, wasn't it, that she hadn't seen him in years? I believe she stated in her declaration she had not seen him in years, but I don't think the record is clear as to the extent that he has visited the children. Well, did you just—I'm just wondering if you disputed that anywhere in the record that you can point us to because I thought that was undisputed. Not that I'm aware of, Your Honor. And regardless of whether he's actually, you know, again, exercised his right to visit the children, the point is he did not give up the right to visit the children in 2016, and instead he provided a lot more value to San Jose TA and informed the BMW. Counsel, respectfully, if somebody moves out of the country, isn't it obvious at that point that they won't be seeing their child on the weekends? I mean, is that really something that needs more elaboration than that? No, Your Honor. Actually, so my understanding is that they actually live quite close to each other across the border. He lives in Tijuana, very close to the border with California, and she lives in Southern California. So the distance is not a very large distance at all. Counsel, I apologize for keep going back to some of Judge Rickleman's points, but I thought, and so I think I'm quoting here, that the district court did not find the self-serving affidavit provided by Sanchez-Diaz had not persuaded the court that she provided good services or other substantially equivalent value in exchange for the BMW. So substantially equivalent, do you think the district court meant substantially equivalent to goods and services writ large or substantially equivalent to the value of the BMW? Substantially equivalent to the value of the BMW. Of the BMW. If we find in the record that she provided some value, not substantially equivalent, but some value, is your case gone? No, Your Honor. So you think it needs to be substantially equivalent to the value of the BMW? Yes. The language, whether it's substantially equivalent value or fair value or adequate value, some sort of value that allows the equitable remedy of disgorgement not to be completely undermined by a massive loophole that would allow individuals... But do you stand by your earlier statements to us that the district court found that she provided no value? My reading of the district court's opinion is that it said that she did not provide any value, goods or services in exchange for the BMW, Your Honor. But the court was well aware of the record... I don't understand that point. Substantially equivalent or no value in the sense of consideration? My reading of the district court's opinion is that it found that she provided no goods or services. But either way, even if you read the opinion to say that she provided some goods or services, its point is that it's not enough to offset or to justify in equity the receipts of $135,000. And that's your argument? Yes, Your Honor.  What's that? She's being netted out of the purchase price that she's obligated to reimburse? That would be the district court's discretion, depending on other facts and circumstances in the case. That obviously did not occur here. But a district court certainly would be within its discretion to net out. If she had given him $25,000 for the BMW, that would certainly be in the discretion of the district court. And then on the pre-judgment interest, what basis is there for opposing pre-judgment interest on her for the period of time prior to when she knew that there might be something wrong with the money? Because the purpose of pre-judgment interest is to compensate the victims for their loss of a time value of money. But there's balancing in equity between the interests of the victims and the interests of an innocent recipient. The restatement of restitution suggests that if the recipient doesn't know, any prior interest would be in the nature of a fine, which you can't do in equity. Well, I think that the district court's in a position to determine, to balance the equities of the victims of the fraud against those of the relief defendant and determine that the pre-judgment interest amount, the victims, excuse me, are due the loss of a time value of the money over that period. During that period, of course, Ms. Sanchez-Diaz was using the BMW and was fully able to realize the value of that money. Sure, but if she'd known, she might have just given it back at that point and not exposed herself to interest accumulating. She may have, Your Honor. But district courts and courts of appeals have affirmed the imposition of pre-judgment interest against relief defendants, even when they're unaware that they've received this court's funds. And Ms. Sanchez-Diaz is not, in fact, contesting the amount of pre-judgment interest that was imposed in this case. She's only contesting the overall award of any pre-judgment interest at all. And so, respectfully, Your Honor, I don't think that that issue is before the court. Counsel, can I just move you to a different issue for a minute? Do you agree that in most cases where you have a disgorgement of a physical asset, like a yacht or a piece of jewelry, the relief defendant is generally ordered to hand over the physical asset if they have it? That's usually what happens, right? If they have it, they have to just hand over the asset. Yes. So if she had still owned the car at the time, the appropriate order would have been for her to hand over the car, the BMW, right? Well, again, that would have been the district court's discretion to make that determination. But that would have been an appropriate order. What's that? That would have been an appropriate order, correct? The district court, depending on the facts and circumstances, would have been in a discretion to order that. It did not in this case. In this case, they ordered her to return the proceeds. Right, because she didn't have the car anymore. Because the amount of the ill-gotten gain is the amount that should be disgorged. The SEC disgorgement cases uniformly across the board require relief defendants to disgorge the full amount of the ill-gotten proceeds, irrespective of whether there's been dissipation or diminution of the asset. My friend did not cite a single SEC case to the contrary. Can I ask you a question about that? So you're saying if she still owned the car and had been asked to hand it over in 2022 when it would have been worth much less than $135,000, it may have only been worth $50,000, you're saying that the court would then have to order her to hand over the car and an additional $85,000? I'm not saying the court would have to do anything. I'm saying it's in the court's discretion to require the relief defendant to disgorge ill-gotten proceeds, and that would be based on the facts and circumstances of the case. But do you have a case that ordered what I just talked about, ordered the disgorgement of the physical asset, which at that point was worth less, plus cash? Do you have any case where that happened, where a court did that? I'm not aware of a case off the top of my head. I do know that in the – no, I'm not aware of a case off the top of my head that matches those exact facts. But, again, there's not – it's clear in the restitution and in the restatement that disgorgement is available with a full amount of proceeds, regardless of whether they've been dissipated. And the idea, if I could just touch on something Judge Howard, I think, was getting at, was that equity – the goal of this principle of equity and disgorgement is to close a loophole that would allow individuals holding funds on behalf of wrongdoers to avoid disgorgement by stating a specious claim of ownership, whether through a self-serving affidavit, a token document, or any other proverbial peppercorn. And so I think what Judge Howard is touching on is even if the district court's opinion is read to provide some small – excuse me, that Sanford G.I. did provide some smidgen of value in keeping – in continuing her obligations with respect to the child, that is not an avenue for her to completely defeat SEC disgorgement claims by providing such a token benefit. With respect, Your Honor, if there's no further questions, I'd like to request that you affirm the district court's decision below. Thank you. Thank you, counsel. At this time, if counsel for the appellant would please reintroduce himself. He has a four-minute rebuttal. Thank you, Brooks Westergaard, on behalf of Relief Defendant Appellant Ms. Sanchez-Diaz. A couple of things I'd just like to clean up based on some of the discussion earlier with opposing counsel. So it is true that according to her declaration, Ms. Sanchez-Diaz did have sole physical custody of she and Mr. Carrillo's son since early 2014, and in 2016 when they executed the child support agreement, it was to memorialize the arrangement that had been in place since that time in 2014. So counsel, as to that, Judge Kayada was asking you what language in the second agreement you were relying on, and as best I could tell, you didn't point to any specific language in either the second or the first agreement. So is it the case that what you're really saying is that these were circumstances outside of the agreements but that the record reflects these circumstances, or do you have some language in the agreements that supports your position? So the language in the agreement that I was referring to, I believe it is in Clause 1, which is the Clause 1 or Clause 2, which Ms. Sanchez-Diaz agrees to full custody and child care responsibilities of the agreement. Now, I think that provision in the 2016 agreement does reflect the circumstances that were already in place since 2014 that were then memorialized in 2016. Is it different than the first agreement? Let's say we were doing contract interpretation. What I'm actually trying to understand is whether this is a broader analysis than just contract interpretation. I thought you told Judge Kayada that there was no difference, really, and that the second one incorporates the first one, and I was waiting to hear you say, and then it adds, but I don't know what it adds, in the language in the agreement itself. Sure. So I think that in the language of the agreement itself, I think the difference is the issue with the visitation rights that were present in the first agreement that were not explicitly carried over into the second agreement. So I think it is a, if we're just talking about the four corners of the agreement, I don't think that there is any material difference other than the fact that she agreed to full custodial and parental rights, and the visitation rights are not implicated in that second agreement. So I think that's the difference. And briefly, I've got about 90 seconds left, but I did want to touch on the question with respect to returning the asset as a form of discouragement rather than the actual full purchase price of the vehicle. Our position is that that difference is important and it's material because it transforms the relief that the SEC sought and obtained from equitable, straight equitable relief into legal relief. We cited it in our brief. The SEC cited it in theirs, too. But the Tenth Circuit's decision, SEC v. Camargo, I think is how you pronounce it, is actually instructive. The majority recognized, and we cited some cases, too, in the ERISA context, that when it's an asset that's been dissipated and is no longer in possession of the relief defendant, then disgorgement of the value of that asset is legal restitution and not equitable restitution. Judge Bacharach, in the Camargo case, actually wrote a very instructive dissent where he basically said, what are we going to do with Lew? Lew said that the only relief available in these types of cases is those types of reliefs that were traditionally available in equity, and the majority in that case actually said that the United States Supreme Court does look to ERISA cases to differentiate between equitable and legal relief. Now, there were tracing issues in that case that are not present here, but the punchline, so to speak, is that disgorgement was typically available in equity, quote, only where money or property identified as belonging in good conscience of the plaintiff could clearly be traced to the particular funds or property in the defendant's possession. That's the difference. Unless the Court has any further questions. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.